**CALEDONIAN ALLOYS,
INC., Plaintiff,**

v.

**SOLUMET METAL & POWDER
INC., Defendant.**

**15 Civ. 9109 (LLS)**

United States District Court,
S.D. New York.

Signed March 31, 2016

Louis Orbach, Bond, Schoeneck & King, PLLC, Rochester, NY, Stephanie M. Campbell, Edward R. Conan, Bond, Schoe-

neck & King, PLLC, Syracuse, NY, for Plaintiff.

Michael Matthew Fay, Berg & Androphy, New York, NY, for Defendant.

## MEMORANDUM & ORDER

Louis L. Stanton, United States District Judge.

Plaintiff Caledonian Alloys, Inc. ("Caledonian") moves to dismiss, for failure to state a claim upon which relief can be granted, defendant Solumet Metal & Powder Inc.'s ("Solumet's") counterclaims for breach of contract, breach of warranty, and a declaratory judgment that a contractual loan was forgiven. *See* Fed.R.Civ.P. 12(b)(6).

### 1.

Solumet's counterclaims 4, 5, 9–13, and 15–17 allege the following (alterations in original):

4. Almost two years later, on or about April 1, 2012, Solumet and Caledonian finally entered into the Agreement, whereby Caledonian agreed to deliver certain defined Materials to Solumet and its thirdparty contractors, and Solumet agreed to pay for some of those Materials. Given its prior business relationship with Solumet, Caledonian knew that the Materials it delivered needed to be suitable for processing at the Facility or the facilities of Solumet's third-party contractors. Further, the Agreement contained a number of express provisions detailing the necessary characteristics of the Materials.

5. However, beginning as early as 2012, Caledonian failed to deliver suitable Materials, and by 2015, Caledonian was delivering non-conforming Materials that were flammable and inherently dangerous. Indeed, on one occasion, Caledonian's Materials actually caught on

fire at one of Solumet's third-party contractors' facilities.

\* \* \*

9. The Agreement provided for the delivery of different kinds of Materials by Caledonian to Solumet for processing. Among these Materials were: WWTP filtercake, nicarbonate cake, pelletizer dust, flue dust, contaminated grindings and floorsweeps, millscale and blaster dust and fines. All of these Materials necessarily needed to be suitable for processing at the Facility and the facilities of Solumet's third-party contractors.

10. In addition, the Agreement provided that, although not guaranteed, "the qualities of the raw materials" from Caledonian were "anticipated to be consistent to the quality of the same raw materials received and processed by Solumet MP in 2009 and 2010." Further, Caledonian was to "do its utmost" to ensure that the Materials it delivered to Solumet did not contain "high Cu[copper]-bearing materials." (Agreement, ¶¶ 2, 6)

11. The parties were obligated to conduct a "yearly evaluation of the contract" to "determine pricing changes, if any," made necessary as a result of "material changes" and the need for "process improvements". Further, "monthly evaluations" of the WWTP filtercake were conducted "to see if any analysis changes occur[ed];" if "major analysis changes" did occur, "both parties [were to] evaluate pricing." (Id. ¶ 2)

12. Finally, Caledonian promised that it would offer exclusively to Solumet all of its contaminated grindings and millscale. (Id.)

13. All of these provisions regarding the Materials were necessary to make the Agreement financially attractive to Solumet. The Materials were industrial waste; Solumet will accept industrial waste of others only if there is a real prospect that iron, nickel and other recyclable metals can be extracted from that waste at a commercially reasonable price, and in sufficient quantities, to be resold at a profit. If these requirements cannot be met, then waste generators like Caledonian must find other ways of disposing of their waste.

\* \* \*

15. Beginning in 2012, Caledonian repeatedly breached the Agreement by delivering to Solumet—without Solumet's knowledge—Materials (principally WWTP filtercake) that were contaminated with flammable solvents, i.e., some unidentified oil-like substance or substances. In fact, the processing of these contaminated Materials actually caused a fire at Solumet's third-party drying facilities at U.S. Ecology, Inc. in Canton, Ohio.

16. Caledonian's contaminated Materials were quite likely hazardous waste ("HAZMAT") under United States federal and states regulations and were required to undergo the costly disposal processes associated with those regulations. The Facility was not capable of processing—nor would Solumet have ever chosen to process—HAZMAT.

17. Caledonian's delivery of these nonconforming Materials was a breach and repudiation of the Agreement. Accordingly, by invoices initially submitted in November 2014, Solumet requested that Caledonian reimburse it for sums that Solumet expended in treating the contaminated Materials. Although Caledonian initially refused to acknowledge any responsibility for these costs, Caledonian ultimately agreed that it would compensate Solumet for these and all additional out-of-pocket expenses that were incurred in the treatment of the contaminated Materials. Nonetheless, Solumet has never received payment.

## 2.

The gravamen of Caledonian's response to these accusations and its chief support for dismissal of the counterclaims are based on the "as is" clause of the Purchasing Agreement (¶ 6), which states:

> *Quality Control.* All material is sold "as is". Caledonian makes no, and specifically disclaims any, representations or warranties of any kind or nature (express or implied) concerning the material delivered to Solumet MP under this agreement. However, Caledonian shall do its utmost to not include high Cu-bearing materials in any of the loads purchased by Solumet MP. It is understood by the parties that the market for Solumet MP's product is the stainless steel market. All sampling and testing is defined in section 3.

## 3.

■ An "as is" clause provides for defects and flaws in the condition of the goods shipped, and puts the burden of inspecting for them on the buyer, but the goods shipped must be those provided by the contract. One may not ship something different, and claim it must be accepted as the original "as is."

■ It has been the law of the State of New York for over a hundred years that the use of an "as is" clause allows the condition of the goods shipped to vary from a sample; but the goods themselves must be the ones contracted for. If the contract is for pussy willow taffeta, then it must be pussy willow taffeta that is shipped; its condition may be "as is." As stated in *Schwartz v. Kohn*, 155 N.Y.S. 547, 548 (1st Dep't 1915):

> The action was to recover for goods sold and delivered. It was apparent from the plaintiff's testimony that the sale was of 'pussy willow' taffeta by sample. It was conclusively proved that the goods delivered were not 'pussy willow' taffeta, nor were they of the quality of the sample. Upon inspection, immediately after delivery, the defendant discovered these facts, and returned the goods by an express company. The plaintiff refused to accept the return, and brought an action for the agreed price, and has recovered judgment.
>
> The plaintiff claims to have sold the goods 'as is,' and they were so billed to the defendant. The use of this phrase does not change the requirement that the goods must be of the kind and quality represented by sample, but refers simply to the condition of the goods. The goods delivered must be 'pussy willow' taffeta of the quality of the sample, even if in a damaged condition. In the case at bar something other than 'pussy willow' taffeta was delivered.

■ In this case, instead of delivering material suitable for further processing as agreed in the Purchasing Agreement, Caledonian shipped material which was not capable of processing, was flammable, and so contaminated as to constitute hazardous waste. That difference is so substantial that it is not a variance in the condition of the specified materials, but a delivery of something different.

## Conclusion

Caledonian's motion to dismiss Solumet's counterclaims (Dkt. No. 14) is denied.

So ordered.